INTERSTATE BRANDS CORPORA-
TION, BUTTERNUT BREAD
DIVISION, Plaintiff–Appellee,

v.

CHAUFFEURS, TEAMSTERS, WARE-
HOUSEMEN AND HELPERS LOCAL
UNION NO. 135, Defendant–Appellant.

No. 89–3287.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 19, 1989.

Decided July 26, 1990.

Rehearing and Rehearing En Banc
Denied Sept. 11, 1990.

**5.** For a helpful discussion of the policies underlying, and the pitfalls in the application of these exceptions, see Countryman, *The Concept of a* *Voidable Preference in Bankruptcy,* 38 Vand.L. Rev. 713, 767–76 (1985).

George E. Yund (argued), Frost & Jacobs, Cincinnati, Ohio, for plaintiff-appellee.

Thomas J. Kircher, Cincinnati, Ohio, William R. Groth (argued), Fillenwarth, Dennerline, Groth & Baird, Indianapolis, Ind., for defendant-appellant.

Before KENNEDY, WELLFORD, and SUHRHEINRICH *, Circuit Judges.

SUHRHEINRICH, District Judge.

Appellant Teamsters Local Union No. 135 ("Union" or "Local 135") appeals the district court's decision vacating the initial and supplemental awards of a labor arbitrator rendered pursuant to a collective bargaining agreement between the Union and Interstate Brands Corporation ("Interstate" or "Company"). Because we find that the district court erred in vacating the arbitrator's award, we reverse.

Interstate is a manufacturer and distributor of bread and bread-related products. Interstate and Local 135 were parties to a collective bargaining agreement ("Agreement") from August 25, 1982 through July 13, 1985 covering a bargaining unit of driver-salesmen employed out of Interstate's Versailles and Madison, Indiana facilities. Article VI of the Agreement limited the Company's right to discharge or suspend an employee for "just cause" only and required that any suspension or discharge be

---

* The Honorable Richard F. Suhrheinrich was appointed to the United States Court of Appeals on July 10, 1990. Judge Suhrheinrich was a United States District Judge for the Eastern District of Michigan, sitting by designation, when this case was argued.

preceded by one warning notice, in writing, unless the employee was discharged for "dishonesty or drunkenness." Article VII provided that a grievance had to be filed "within fifteen (15) days of its occurrence, or the parties awareness thereof ..." and also included a clause which stated: "In the event that such grievance is not submitted within this fifteen (15) day period, said grievance shall automatically be decided in favor of the defending party." Article VII 3(a). Finally, section 3(f) of Article VII authorized the arbitrator to interpret and apply the Agreement but also cautioned that the arbitrator "shall have no authority to add to, subtract from, or in any way modify the terms of this Agreement...."

Grievant Randy Furst ("Furst" or "Grievant") was a driver/salesman for Interstate who drove a 20–foot step van to deliver Interstate's products to stores, restaurants, and schools. At the time of the incident giving rise to the instant dispute Furst had ten years of seniority with Interstate.

On April 11, 1984, on his day off, Furst and a friend were arrested by the Greater Cincinnati Airport police on a road near the airport. They were driving a non-company vehicle. When an officer with the Kenton Airport Authority approached the stopped van, he found Furst, who was seated in the passenger seat, in a disoriented condition with slurred speech and alcohol on his breath. After noticing a white powdery substance in a plastic bag on the van's motor cover, the officer arrested Furst and his friend. The officer also observed blood and needle marks on Furst's arm and summoned a paramedic. Upon questioning, Furst told the officer that he was attempting to shoot up cocaine when the officer arrived.

Furst was charged under Kentucky law with possession of cocaine, marijuana, and drug paraphernalia. The State of Kentucky agreed not to prosecute Furst and to dismiss all charges against him on the condition that Furst complete a drug rehabilitation program and not commit any criminal act for twelve months. On February 25, 1986, one year after the diversion agreement was entered by the Kentucky court, Furst successfully completed all the conditions of the diversion agreement and all criminal charges against him were dismissed.

On April 13, 1984, Interstate's General Manager was informed that Furst had been arrested on drug charges. On April 19, 1984, representatives of the company confronted Furst with the unconfirmed reports. Furst denied the rumors. Interstate received copies of the police report on April 20, 1984, and once again confronted Furst, who denied the report's account of the incident. The Company suspended Furst on April 21, 1984, stating orally that his suspension would last "until this thing was dismissed proving his innocence." Furst filed the grievance protesting his indefinite suspension on June 8, 1984, forty-eight days after he was suspended. Interstate denied the grievance as untimely.

The parties were unable to settle Furst's grievance and selected an arbitrator, Arthur R. Porter, to hear and decide 1) whether the grievance was arbitrable; and 2) whether there was just cause for the suspension of Furst. On May 25, 1985, the arbitrator issued an award sustaining the grievance and ordering Interstate to end the suspension and to reinstate the grievant. He also granted appropriate back pay and benefits.

In that award the arbitrator found that Furst did use cocaine and that the Company was warranted in its initial suspension of Furst pending a more complete investigation of the circumstances leading to Furst's arrest. The arbitrator also found that Furst and Local 135 had lost their right to protest the initial suspension by failing to file a grievance within fifteen days of the suspension. Notwithstanding, he further found that the suspension was a "continuing act" which could be grieved at any time. In setting aside the suspension the arbitrator stated that the Company's decision had placed Furst in a difficult position since his reinstatement was made contingent upon an impossible condition; namely, a judicial disposition of his inno-

cence. He also noted that Interstate had no guidelines or policies to judge off-the-premises, off-hour activities by a driver/salesman, and stated that the policies established for in-plant employees were "contradictory and confusing." In this regard, he pointed out that Interstate's representative had testified that an employee convicted of "driving under the influence" would not have been penalized as long as the illegal act occurred outside normal work hours and off the premises.

Interstate subsequently filed suit in federal district court to vacate the arbitrator's award. The Union counterclaimed for enforcement. Following the filing of cross-motions for summary judgment, the district court denied both motions and remanded the case to the Arbitrator to render a final decision on back pay. On August 20, 1988, the arbitrator found a six-month suspension to be appropriate and ordered back pay from October 11, 1984, minus any interim earnings, unemployment compensation received, and compensation which Furst would not have been able to earn during a twenty-two day period in 1987 when his driver's license was temporarily suspended as a result of a conviction for driving while under the influence of alcohol.[1]

On March 9, 1989, the district court vacated the arbitration award and supplemental award on the grounds that the grievance was not timely filed and that the arbitrator had exceeded his authority in the interpretation of the labor contract. Further, in obiter dicta, the district court stated that Furst's reinstatement violated a well-defined public policy against permitting habitual users of mind-altering illegal drugs from operating motor vehicles.

The Union now appeals from this decision, contending that the district court, in vacating the arbitration awards, exceeded its authority by substituting its judgment for that of the arbitrator on the issue of whether the grievance was timely filed, and erred in its determination that the award requiring the reinstatement of the grievant violated public policy.

I.

It is a well-established principle that courts play only a limited role in reviewing labor arbitration awards. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987). In *Misco*, the Supreme Court reaffirmed its longstanding commitment to the highly deferential standard of review of arbitrator's decisions, a principle which has its genesis in the *Steelworkers Trilogy*.[2] In those landmark labor cases, the Supreme Court stated that "the federal policy of settling labor disputes by arbitration would be undermined if the courts had the final say on the merits of the awards." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Under this line of authority a court may not reconsider the merits of an award even when the parties allege that the award rests on errors of fact or on misinterpretation of the Contract. *Misco*, 484 U.S. at 36, 108 S.Ct. at 369–70. As long as the arbitrator's award " 'draws its essence from the collective bargaining agreement,' and is not merely the arbitrator's 'own brand of in-

---

1. On September 5, 1986, Furst was charged with driving under the influence, and was found guilty of the reduced charge of reckless driving by the Batesville, Indiana City Court. On October 23, 1986, Furst was fined $72.00 for speeding, $277.00 for driving under the influence, and his driver's license was suspended for thirty days and thereafter the suspension was converted to a probationary driver's license, the probationary status of which terminated on June 7, 1987. Under the terms of the probation, Furst was allowed driving privileges to and from work and in connection with employment activities during the day. The Arbitrator, however determined that these incidents did not require

modification of the reinstatement remedy because the actions occurred one and one-half years after the arbitration award and two and one-half years after the suspension.

2. *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (collectively the *"Steelworkers Trilogy"*).

dustrial justice,'" the Court must enforce the award. *Id.* (quoting *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361).

In *Misco, supra,* the Supreme Court defined the scope of judicial review of arbitration awards as follows:

Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a Court should not reject an award on the ground that the arbitrator misread the contract.... [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

*Misco,* 484 U.S. at 37–38, 108 S.Ct. at 370–71.[3] This Court has recently expressed its adherence to the principles discussed in *Misco, supra. Eberhard Foods, Inc. v. Handy,* 868 F.2d 890, 891 (6th Cir.1989) (noting that the *Misco* Court "again ad-

vised lower federal courts to be more deferential to the arbitration process").

■■■■ This highly deferential standard of review is perhaps most commonly extended to the substantive issue of what constitutes sufficient and reasonable cause for discharge. *Florida Power Corp, v. IBEW Local 433,* 847 F.2d 680, 681–82 (11th Cir. 1988) (and cases cited therein). *See also Anaconda Co. v. Machinists District Lodge No. 27,* 693 F.2d 35, 37 (6th Cir.1982) ("'just cause' ... has frequently been upheld as the basis for an arbitrator's award"). On the question of procedural arbitrability, a court's role is even more sharply circumscribed. The Supreme Court observed in *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964), that when the subject matter of a dispute is arbitrable, "procedural" questions which grow out of the dispute and bear on its final disposition are the exclusive province of the arbitrator. In *Misco, supra,* the Court held that an arbitrator's procedural rulings must not be disturbed by a court unless the arbitrator's error is "in bad faith or so gross as to amount to affirmative misconduct." 484 U.S. at 40, 108 S.Ct. at 372.

On appeal the Union asserts that the arbitrator's ruling on the timeliness issue is a matter of procedural arbitrability. Thus, it argues that the district court erred in failing to apply the "affirmative misconduct" standard of review set forth in *Misco* when it vacated the award. Interstate counters that the question of whether a contract creates a duty to arbitrate a particular grievance is initially a question for the courts and that in the instant case, the

---

**3.** The *Misco* court's characterization of the role of judges in the process of collective bargaining is an affirmation of prior Supreme Court pronouncements on the subject:

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbi-

trator's judgment, when it was his judgment and all that it connotes that was bargained for.

The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.

*Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (footnotes omitted); *see also AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649–50, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986).

language of the Agreement indicates a clear intention by the parties to foreclose the arbitration of untimely grievances altogether. In the alternative, Interstate argues that the arbitrator's ruling is not subject to the "affirmative misconduct" standard of review, but rather is properly evaluated under the standard of review applied to substantive rulings of an arbitrator. Under this standard, Interstate argues that the arbitrator exceeded his authority under the Agreement when he found that Furst's suspension was a continuing act that could be grieved at any time and that his award fails to "draw its essence from the contract."

### A.

Before we can address the Union's argument that the arbitrator's ruling on arbitrability is properly reviewed under the *Misco* "affirmative misconduct" standard, we must first examine the Company's contention that the issue of arbitrability is initially a question for the court. The Supreme Court has held that the question of arbitrability—whether the collective bargaining agreement at issue creates a duty to arbitrate a particular grievance—is a matter for judicial determination. *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (citing *Warrior & Gulf, supra,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53).[4] *See also Distillery, Wine & Allied Workers Int'l Union, Local Union No. 32 v. National Distillers & Chemical Corp.,* 894 F.2d 850 (6th Cir.1990). On the other hand, a panel of this court most recently held that when the parties have submitted the issue of arbitrability to the arbitrator rather than reserving the question for initial determination by the court, the arbitrator's decision on arbitrability must stand "unless it fails to 'draw its essence from the collective bargaining

agreement.' " *Vic Wertz Distributing Co. v. Teamsters Local 1038, National Conference of Brewery and Soft Drink Workers of the United States of America and Canada,* 898 F.2d 1136 (6th Cir.1990) (citation omitted).

■ In the present case, as in *Vic Wertz,* the parties submitted the issue of arbitrability to the arbitrator in the first instance. By participating in the arbitration proceedings, Interstate implicitly agreed to have the arbitrator decide the issue of timeliness, and hence arbitrability, *Vic Wertz* 898 F.2d at 1140; and thereby waived its right to have the court make those rulings. Thus, the nature of our review of the arbitrator's ruling on arbitrability is different than the situation where the Company refused to arbitrate altogether and the Union brought an action in district court to compel arbitration. A case cited by Interstate, *General Drivers, Warehousemen and Helpers, Local Union 89 v. Moog Louisville Warehouse Inc.,* 852 F.2d 871 (6th Cir.1988), *reh'g denied* (Sept. 30, 1988), *appeal after remand,* 892 F.2d 79 (6th Cir. 1989) (TABLE) (per curiam), is therefore distinguishable from the instant case. In *Moog,* unlike the case before us, the company had refused the union's demand for arbitration, contending that the request made was untimely and rendered the grievance not arbitrable. 852 F.2d at 872. The union then brought an action in district court to compel the company to arbitrate. This court held that the contractual language in that case clearly indicated that the particular grievance in dispute was excluded from arbitration unless the court first found that the union had met the conditions precedent to arbitration. 852 F.2d at 875.

### B.

■ Our determination that *Vic Wertz* governs Interstate's argument on the arbi-

---

**4.** Similarly, in *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court stated:

Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into the parties.... The

duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty.

*Id.* at 546–47, 84 S.Ct. at 912–13 (citations omitted).

trability issue also disposes of the Union's contention that the arbitrator's ruling on the arbitrability of a grievance is a purely procedural question within the exclusive purview of the arbitrator and therefore subject to the "affirmative misconduct" standard set forth in *Misco*. As made clear in *Vic Wertz*, we cannot overturn the arbitrator's ruling on arbitrability unless we find that his decision fails to draw its essence from the collective bargaining agreement.

▮ The district court vacated the arbitrator's award because it concluded that the grievance was not timely filed and that there was no ambiguity in the agreement warranting the arbitrator's interpretation of "occurrence." The court relied upon the standard of review set forth in *Dobbs, Inc. v. Teamsters Local 614*, 813 F.2d 85 (6th Cir.1987), a pre-*Misco* decision, where the court held that an arbitrator's interpretation of the substantive terms of a collective bargaining agreement is not to be disturbed unless the arbitrator's award "fails to draw its essence" from the agreement. The Union argues on appeal that the arbitrator's interpretation of "occurrence" was reasonable in the context of the *sui generis*[5] form of discipline selected by Interstate. While we do not find fault with the standard of review employed by the district court, we disagree with the district court's analysis.

▮ The arbitrator determined that under the Agreement Furst's delay in filing the grievance resulted in his having waived the right to challenge the suspension of April 21, 1984. Despite this delay, the arbitrator concluded that the grievance was arbitrable as a continuing grievance that could be grieved at any time, "even though that grievance emphasizes the act of suspension rather than its continuing nature." Arb. Award at 6. Interstate contends that in so ruling, the arbitrator ignored the "unambiguous" language in Article VII, Section 3(a) of the Agreement requiring that a grievance be filed within fifteen (15) days of "its *occurrence* or the parties' *awareness* thereof." Specifically, Interstate contends that the conclusion that Furst had waived his right to challenge the April 21, 1984 suspension should have been the end of the arbitrator's inquiry. Interstate argues that this ruling violates the provision of the Agreement which deprives the arbitrator of the authority to "add to, subtract from or in any way modify" the terms of the Agreement. Finally, Interstate argues that the arbitrator superimposed his own notions of industrial fairness by reaching beyond the clear language of the Agreement to decide that the suspension was a "continuing act." Therefore, Interstate maintains that under *Misco*, the arbitrator's award fails to "draw its essence from the contract" and was therefore properly set aside by the district court.

Interstate asks this Court to give a narrow interpretation to the term "occurrence." However, as the Supreme Court held in *Misco*, contract interpretation is the exclusive province of the arbitrator. While the "arbitrator may not ignore the plain language of the contract," we would not be free to vacate his award even if we were convinced that he has committed a "serious error." *Misco*, 484 U.S. at 38, 108 S.Ct. at 371. Here, the arbitrator's finding that the suspension was a "continuing act" or "occurrence" which could be grieved at any time does not appear to be based upon a misreading or modification of the language of the Agreement. The indefinite nature of Furst's suspension contemplated a continuing, day-to-day suspension (i.e., "occurrence"), the termination of which was to be conditioned upon a future event, the proving of his innocence, Rather, the arbitrator was construing the terms of the agreement, in particular the terms "occurrence" and "awareness," in light of an indefinite suspension pending the conviction or acquittal of an employee in a criminal case.

---

5. An indefinite suspension, the continuation of which is conditioned upon some future event, such as the outcome of criminal proceedings pending against an employee, is unlike a discharge or suspension for a definite length of time and is instead a *sui generis* form of discipline, the propriety of which can be judged *only* on the basis of subsequent awards. *Brown v. Dept. of Justice*, 715 F.2d 662, 669 (D.C.Cir. 1983).

Because we fail to see any inconsistency or contradiction between this ruling and any other language in the Agreement and we further find that the arbitrator was at least "arguably construing" the contract, we conclude that his decision on arbitrability draws its essence from the collective bargaining agreement.[6] Moreover, this Court has upheld arbitrator's rulings on much more attenuated grounds. *See Dixie Warehouse and Cartage Co. v. General Drivers, Warehousemen and Helpers, Local Union No. 89*, 898 F.2d 507 (6th Cir. 1990) (upholding arbitrator's ruling reinstating an employee who had been discharged for using alcohol while on duty despite employer's established policy of discharging employees who use alcohol while on duty since nothing in the collective bargaining agreement expressly limited or removed from the arbitrator the authority to review the remedy).

Not only do we conclude that the arbitrator was at least "arguably construing" the Agreement, we find that the arbitrator brought his "informed judgment to bear in order to reach a fair solution." *Misco*, 484 U.S. at 41, 108 S.Ct. at 372 (citation omitted). This is not to say that an indefinite suspension may never be warranted when imposed, but rather that good cause for it may expire, as the arbitrator found in this case. The result sought by Interstate, as argued by the Union to the arbitrator, places Furst in a "twilight zone," both with and without a job, with no foreseeable means of escape.

### II.

The second issue before us on appeal is whether the district court erred in concluding that the award requiring the reinstatement of Furst violated public policy. In

W.R. *Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), the Supreme Court created a public policy exception to the finality of arbitration awards by holding that a court may not enforce a collective bargaining agreement that is contrary to public policy. *Id.* at 766, 103 S.Ct. at 2183.[7] The Court stated that the question of public policy is ultimately one for resolution by the courts. *Id.* It stressed, however, that a court's refusal to enforce an arbitrator's interpretation of such an agreement is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* (internal quotations and citations omitted). In *Misco*, the Supreme Court revisited the public policy doctrine established in W.R. *Grace*. There the Court observed that its decision in W.R. *Grace* did not "otherwise sanction a broad judicial power to set aside arbitration awards as against public policy," 484 U.S. at 43, 108 S.Ct. at 373, and stressed that "[a]t the very least, an alleged public policy must be properly framed under the approach set out in W.R. Grace, and the violation of such a policy must be clearly shown if an award is not to be enforced." *Id.*

In the instant case, in obiter dicta, the district court stated its belief that "this is a case where reinstatement would violate public policy of Ohio, Kentucky, and Indiana as expressed in their laws outlawing driving under the influence, as well as dealing in illegal mind-control substances." The district court also relied upon Furst's convictions for reckless driving and driving under the influence on two occasions. In-

---

**6.** Since the arbitrator's interpretation of "occurrence" with respect to Furst's grievance effectively dissipates any timeliness of filing issue, we need not give further consideration to Interstate's argument that the language of the Agreement is indistinguishable from the relevant contractual language in *Moog*.

**7.** This exception is essentially a specific application of the more general common law doctrine that a court may refuse to enforce contracts that

violate law or public policy. W.R. *Grace*, 461 U.S. at 766, 103 S.Ct. at 2183. In Misco, the Supreme Court noted that the doctrine is justified by the observation that "the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements." 484 U.S. at 42, 108 S.Ct. at 373.

terstate maintains on appeal that the reinstatement of Furst would violate the strong public policy set forth by the legislatures of Ohio,[8] Kentucky,[9] and Indiana,[10] against the operation of motor vehicles by persons under the influence of mind-altering substances.

██ Review of the district court's purported public policy justification for its decision to reverse reveals that it fails to satisfy the *Grace–Misco* standard. First, the *only* legal citation provided by the district court is an undifferentiated reference to *Misco*. The district court is therefore guilty of the very same conduct criticized by the Supreme Court in *Misco;* namely, the failure to review existing law and legal precedents in order to determine whether a "well defined and dominant" public policy has been violated by the reinstatement. Reversal is proper on this basis alone.

██ Second, as noted by the Union, the district court also mischaracterized the public policy issue. A careful reading of the district court's opinion reveals that it was in actuality evaluating Furst's behavior. The issue is not whether grievant's conduct for which he was disciplined violated some public policy or law, but rather whether the award requiring the reinstatement of a grievance, i.e., "the contract as interpreted," *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183, violated some explicit public policy.

The district court failed to identify any law or legal precedent with which that arbitrator's reinstatement order would conflict. While it is indisputable that allowing intoxicated persons to drive motor vehicles violates public policy, it does not follow, however, that any arbitration award reinstating an employee discharged for being intoxicated while off-duty, or arrested for off-duty possession of controlled substances may never be enforced without violating the public policy exception of arbitration awards.

Interstate relies principally upon two post-*Misco* decisions to support its argument that reinstatement of Furst would violate public policy, *Iowa Electric Light & Power Co. v. IBEW Local 204*, 834 F.2d 1424 (8th Cir.1987); and *Delta Air Lines Inc. v. Airline Pilots Ass'n Int'l*, 861 F.2d 665 (11th Cir.1988), *cert. denied* — U.S. ——, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989). In *Iowa Electric*, the Eighth Circuit refused to reinstate a nuclear power plant employee who had deliberately compromised a reactor safety system, despite the arbitrator's finding that termination was too severe a sanction for the misconduct. 834 F.2d at 1426. The court found that that was a well-defined and dominant policy requiring strict adherence to nuclear safety rules. *Id.* at 1427. In *Delta*, the Eleventh Circuit affirmed the discharge of an airline pilot who operated an airplane while under the influence of alcohol. The Court, in applying *Misco*, noted that the illegal misconduct must be "integral to the performance of employment duties." *Id.* at 671. In addition, the court enumerated the laws and legal precedents violated by the pilot's actions. *Id.* at 672–74. Both cases are distinguishable from the instant case, however, since both involved on-duty misconduct and were found to violate well-

8. The site of Interstate's main plant. *See* Ohio Rev.Code Ann. § 4511.19 (Anderson Supp.1988) (providing that no person shall operate any vehicle while under the influence of alcohol or drugs); Ohio Rev.Code Ann. § 4507.08(A) (prohibiting the issuance of an operator's or chauffeur's license to a person who is an alcoholic or addicted to the use of controlled substances to the extent that the use constitutes an impairment of the person's ability to operate a motor vehicle safely).

9. The site of Furst's arrest, the performance of the diversion agreement, and some of Furst's delivery routes before he was suspended. *See* Ky.Rev.Stat.Ann. 189A.010(1)(Miche 1989) (pro-

viding that no person shall operate a motor vehicle anywhere in the state while under the influence of alcohol or any other substance which may impair the ability to drive); Ky.Rev.Stat.Ann. § 186.440(4) (proscribing the granting of operator's licenses to habitual drunkards or drug addicts).

10. The site of Furst's employment. *See* Ind. Code Ann. § 9–11–2–2 (Burns 1987) (classifying the operation of a motor vehicle while under the influence of alcohol or a controlled substance as a Class A misdemeanor); Ind.Code Ann. § 9–1–4–30(c) (prohibiting the issuance of a driver's license to habitual drunkards and drug addicts).

defined and dominant laws and legal precedents.[11]

In any event, the policies of the states involved do not attempt to prohibit driving by persons who have been convicted of either drunk driving or impaired driving because of drug use. Rather, these policies permit persons to drive under those circumstances where they have a driver's license. The states' well-defined policy is only to prohibit driving by those whose licenses have been revoked.

The district court failed to support its public policy dicta for a third reason. The district court based its decision to vacate Furst's reinstatement in part upon Furst's convictions for reckless driving and driving under the influence on two occasions.[12] The arbitrator, however, made note of these incidents but refused to consider the convictions on the grounds that they were too remote from the challenged suspension. It is clear from *Misco* that this Court may not review an arbitrator's judgment on procedural issues, such as the question of whether to admit evidence of later convictions, which grow out of the dispute and bear on its final disposition. *Misco*, 484 U.S. at 40, 108 S.Ct. at 372 (citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964)). Nor is there any suggestion or hint in the record of "affirmative bad faith" or "gross misconduct" by the arbitrator in making this ruling. Further, as in *Misco*, we find that the district court engaged in impermissible fact finding in basing its decision to vacate Furst's reinstatement in part upon evidence excluded by the arbitrator; namely, Furst's conviction for reckless driving and driving under the influence. *See id.* 484 U.S. at 44–45, 108 S.Ct. at 374. Finally, to conclude from the fact that Furst had been indicted for possession of cocaine, marijuana and drug paraphernalia, that Furst had ever been or would be in the future under the influence of drugs or alcohol while driving a bread truck was also an exercise in factfinding, a function the district court was not authorized to perform. *Id.* (holding that assumed connection between the marijuana gleanings found in employee's car and employee's actual use of drugs in work place was tenuous at best and provided insufficient basis for holding that reinstatement would actually violate public policy).

In sum, we conclude that the district court erred in vacating the arbitration award. Accordingly, we REVERSE and REMAND with instructions to reinstate the arbitrator's award.

WELLFORD, Circuit Judge, concurring.

I reluctantly concur in the judgment to reverse the decision of the district court. I write separately to express concern that in this and in another recent case in our court arbitrators have seemed determined to counter employers' efforts to deal appropriately with employees who have used, or abused, alcohol or drugs in job-related situations. Here an employer was confronted with facts showing that one of its employees had a severe drug and/or alcohol problem. Realizing that this employee was operating its trucks on public roads and highways and was making deliveries to public facilities, including schools, Interstate Brands responsibly suspended the employee in an effort to prevent a disaster.

As a matter of public policy, I would amend the arbitrator's award to limit benefits to Furst up to the date on which he was found guilty by an Indiana court of alcohol-related driving offenses in 1986.

---

**11.** In *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200 (9th Cir.1989), the Ninth Circuit criticized both *Iowa Electric* and *Delta* as being inconsistent with *Misco* and declined to follow them. 886 F.2d at 1215 (en banc) (holding that California's general interest in safe motor vehicles did not form explicit and dominant public policy that would bar reinstatement of a mechanic who committed a reckless act in the course of his employment). We need not address this schism, however, since we find a dispositive factual distinction.

**12.** The parties brought these post-award convictions to the arbitrator's attention in their stipulations submitted to the arbitrator pursuant to the district court's remand order. Arbitrator's Supplemental Award at 2.

As of that date it was clear that Furst's serious problem with alcohol and drugs was a continuing one, and Interstate Brands should no longer have been required to place itself and the public at risk by allowing Furst to operate its large vehicles on highways and in school yards.

The arbitrator's decision in this case goes to the limits of unusual interpretation of an agreement which seems clear and unequivocal on its face. Only because the Supreme Court, in *United Paperworkers v. Misco*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), seems to tie the hands of the courts in reviewing enforcement of arbitration awards do I concur in this reversal of the district court. *See also Dixie Warehouse v. General Drivers, Warehousemen, Local Union No. 89*, 898 F.2d 507 (6th Cir.1990) (an egregious result reinstating an employee drinking while on duty).

I also find the issues here extremely close with respect to the procedural aspect and deficiencies of the Union's claim on behalf of Furst. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *General Drivers, Warehousemen, Local Union No. 89 v. Moog Louisville Warehouse, Inc.*, 852 F.2d 871 (6th Cir.1988).

With strong reservations, then, I defer to a result which seems to be both illogical and potentially dangerous.