**TENNESSEE VALLEY AUTHORITY, Plaintiff–Appellee,**

v.

**TENNESSEE VALLEY TRADES AND LABOR COUNCIL, Defendant–Appellant.**

**No. 98–5583.**

United States Court of Appeals, Sixth Circuit.

Argued: April 21, 1999.

Decided and Filed: July 14, 1999.

A. Jackson Woodall (argued and briefed), Thomas F. Fine, Senior Litigation Attorney (briefed), Linda J. Sales–Long (briefed), Tennessee Valley Authority, Knoxville, Tennessee, for Plaintiff–Appellee.

R. Jan Jennings (argued and briefed), Branstetter, Kilgore, Stranch & Jennings, Nashville, Tennessee, for Defendant–Appellant.

Before: MERRITT, GUY, and DAUGHTREY, Circuit Judges.

The court delivered a PER CURIAM opinion. RALPH B. GUY, Jr., J. (p. 521), delivered a separate dissenting opinion.

## OPINION

PER CURIAM.

Tennessee Valley Trades and Labor Council, the defendant below, appeals the district court's judgment vacating an arbitration award that ordered plaintiff Tennessee Valley Authority to reinstate Robert W. Ingle to his former position as a nuclear reactor unit operator at the Watts Bar Nuclear Plant. Because we conclude that the award "drew its essence" from the collective bargaining agreement between the parties, we find it necessary to reverse the district court's judgment and reinstate the arbitration award.

### PROCEDURAL AND FACTUAL BACKGROUND

On April 27, 1995, Robert W. Ingle, a nuclear reactor unit operator at TVA's Watts Bar Nuclear Plant, tested positive for marijuana in a random drug screen. TVA notified Ingle of the positive drug test by letter dated May 8, 1995, and informed him that the positive drug test constituted a violation of the fitness for duty policy. That letter also informed Ingle that according to TVA policy, he was required to take the following actions before management would make a decision about whether to return him to his position: (1) contact the TVA Employee Assistance Program within five calendar days; (2) obtain TVA Health Services' approval for return to work; and (3) provide a negative alcohol and drug test administered by TVA's Health Services. The following day, on May 9, 1995, the manager of nuclear safety informed Ingle by letter that his security clearances had been suspended. That same day, Ingle met with a representative of the Employee Assistance Program, discussed his circumstances, and signed an agreement to participate in the company's drug program. However, the Program representative declined to enroll him because "it would be unethical to recommend enrollment in a treatment program if he did not have a problem." Ingle returned to the Employee Assistance Program fourteen days later, as the Program representative had instructed him, and provided another urine sample which tested negative for drugs. A doctor also examined him during that visit. During the following week, Ingle also underwent two psychological evaluations, the first by Dr. Boatwright, and the second by Dr. Sajwaj. On June 8, 1995, Dr. Sajwaj confirmed the denial of Ingle's access clearance by letter and urged him to contact the Employee Assistance Program counselor to develop an appropriate drug treatment program. The following day, Ingle again contacted the Program counselor and was again told that a rehabilitation program was not indicated.

As detailed in the arbitrator's decision, in the ensuing several weeks, Ingle struggled, unsuccessfully, to understand and comply with confusing instructions, primarily from Dr. Sajwaj, regarding his responsibilities and rights in appealing the denial of his security clearances. For example, Sajwaj told Ingle that he had no right to provide input into the selection of an independent psychologist who would ex-

amine him for purposes of the appeal or to know the psychologist's identity. But Sajwaj later testified during the arbitration hearing that although he had refused to disclose to Ingle the identity of the psychologist, he would have allowed Ingle to be interviewed by the psychologist if Ingle had so requested. In addition, Ingle met with a psychiatrist on August 8, 1995, in compliance with Sajwaj's suggestion, but the psychiatrist found no evidence of psychiatric disturbance or chemical dependence and considered Ingle fit to return to work. However, the report was never considered in Ingle's appeal because it was obtained too late to be submitted to the independent psychologist. Sajwaj later testified at the hearing that if Ingle had requested a time extension, the report would have been considered. On August 10, 1995, a health services manager at TVA, Gary DePew, upheld on appeal TVA's decision to revoke Ingle's access clearances. However, TVA had already terminated Ingle's employment for failure to maintain his security clearances and failure to meet the requirements of TVA's fitness for duty program on July 5, 1995, over one month before DePew's issued his final decision on those matters.

In accordance with the collective bargaining agreement between TVA and the Tennessee Valley Trades and Labor Council[1], entitled the General Agreement, Ingle filed a grievance alleging that TVA had treated him unfairly. After an arbitration hearing on Ingle's grievance, the arbitrator, who was a former manager of Labor Relations for TVA, issued a formal opinion granting the grievance and ordering TVA to reinstate Ingle. The arbitrator found that Ingle "was employed approximately 17.5 years and except for some concern regarding leave use during a relatively short period of time, had a very good record, no complaints, no problems, no dis-

cipline." The arbitrator recited portions of the testimony given by one of Ingle's supervisors, "who had worked with and/or supervised Mr. Ingle during most of his tenure at Watts Bar" and who stated that Ingle "could do more work in six hours than a lot of people could do in eight," was "a highly intelligent unit operator" and was "well liked and respected by those he supervised." The supervisor also responded in the affirmative when asked whether she would have confidence in Ingle if he were working for her today. The arbitrator also quoted another TVA employee, who had worked with Ingle for at least six years, who stated that he "would trust [Ingle] with anything I own, which also implies I'd trust him with anything TVA owns." The co-worker also said he "would have no reservations at all about working with [Ingle] today."

The arbitrator further found that "[i]t is uncontested that the Grievant, Mr. Ingle, did in fact smoke some marijuana that resulted in a positive drug test. It is a fact that the act was in violation of the law and TVA Policy. Federal and TVA Policy recognize that, as desirable as it may be, we do not live in a perfect world. People make mistakes. Mr. Ingle has never denied that he made one, which according to him he regrets very much and will not repeat. TVA's policies and procedures, based upon the appropriate laws and [Nuclear Regulatory Commission] regulations, are designed to deal with people who do make mistakes. One of the major questions at issue is whether Mr. Ingle was given the benefit of the proper, fair application of TVA's own policies and procedures."

After discussing TVA's application of its policies and procedures to Ingle, the arbitrator concluded that TVA had not fairly applied those policies and procedures and

1. Tennessee Valley Trades and Labor Council is "an unincorporated association of six (6) international trade unions ... that represents a segment of TVA employees during the negotiation and execution of comprehensive col-

lective bargaining agreements with TVA." *Int'l Assoc. of Machinists and Aerospace Workers v. Tennessee Valley Auth.*, 155 F.3d 767, 769 (6th Cir.1998).

had also failed to provide due process in reaching the decision to terminate Ingle. Specifically, the arbitrator expressed the following concerns about the lack of due process provided by TVA:

> There are certain requirements for affording due process which I believe to be commonly recognized and accepted. In general, it must offer an appellant a fair opportunity to defend against whatever charges have been made. The rules governing appeals must be published, equally available to the parties in dispute, and adhered to by both parties. Somewhere in the process the accused is entitled to in-person, oral arguments in his/her defense. In the case of Mr. Ingle, I find credible due process absent for the following reasons:
>
> 1. His 17.5 year employment record was not considered.
>
> 2. Time limits for submission of appeals/evidence were at best vague and confused. In at least one instance apparently Dr. Sajwaj [TVA's lead psychologist] was the only person who knew what rules applied.
>
> 3. He was not informed of the right to an interview with the independent psychologist. If in fact this right did exist, Mr. Ingle was made aware of it approximately one year too late, during Dr. Sajwaj's testimony at the Arbitration hearing.
>
> 4. Mr. DePew's decision, which was final with no further review within TVA, was made based at least in part on an invalid document. Dr. Nagle's, the independent psychologist's recommendations had no signature. Yes, he signed the report approximately one year later. I do not question the document was in fact Dr. Nagle's report. However, in a matter of such grave importance to the future of the Grievant, I believe management is obligated to act with as near certainty as possible. Acting on an unsigned document does not fulfill that obligation.

The arbitrator also expressed his concern about the manner in which TVA handled its requirement that Ingle enter drug counseling through its Employee Assistance Program and concluded that:

> Mr. Ingle was presented with a classic "catch–22." There was no way Dr. Sajwaj was going to approve Mr. Ingle's return to work unless he, "developed an appropriate treatment or counseling program and made substantial progress in it." Although Mr. Ingle complied with the [Employee Assistance Program] recommendations and was evaluated by a private psychiatrist, he could not "develop an appropriate treatment or counseling program and make substantial progress in it."

As a result of these due process concerns, the arbitrator concluded that "Mr. Ingle's termination was unjustified and unwarranted in that he was not afforded due process to which he was entitled under the General Agreement and TVA Policy," and accordingly granted the grievance and ordered TVA to reinstate Ingle.

TVA then commenced this civil action seeking vacation of the arbitration award, and defendant Council sought a judicial order confirming and enforcing the award. In the district court, TVA contended that the arbitrator's decision did not draw its essence from the General Agreement, was at variance with another contract between the parties, the Framework Agreement, and was contrary to public policy. The district court agreed with TVA's first two arguments, and found it unnecessary to address its public policy argument. Accordingly, the district court vacated the arbitration award. This appeal followed.

### DISCUSSION

 Although we review the district court's grant of summary judgment de novo, "courts play only a limited role when asked to review the decision of an arbitrator." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In fact, our review

of an arbitration award is "one of the narrowest standards of judicial review in all of American jurisprudence." *Lattimer–Stevens Co. v. United Steelworkers*, 913 F.2d 1166, 1169 (6th Cir.1990). A court may not reject an arbitrator's findings of fact "simply because it disagrees with them." *Misco*, 484 U.S. at 38, 108 S.Ct. 364. Given the strong federal policy in favor of enforcing arbitration agreements, a court must enforce an arbitrator's award as long as it "draws its essence from the collective bargaining agreement," and is not merely "his [or her] own brand of industrial justice...." *Id.* at 36, 108 S.Ct. 364 (quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* at 38, 108 S.Ct. 364.

■ "An arbitrator's award fails to draw its essence from the agreement when: (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement." *Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local Number 7*, 114 F.3d 596, 600 (6th Cir.1997) (internal quotation marks omitted).

■ The district court agreed with TVA's contention that the arbitrator's remedy did not draw its essence from the General Agreement because it was based on general considerations of fairness and equity instead of the precise terms of the agreement:

> This appeal does not concern the revocation of Mr. Ingle's unescorted access authorization, a matter clearly covered by a specific body of federal law, not by the collective bargaining agreement.

The issue before the arbitrator was the termination of Mr. Ingle's employment, not the decision concerning his status as an access-authorized nuclear unit operator under the applicable [Nuclear Regulatory Commission] regulations. Yet the arbitrator used the case before him as a vehicle to engage in a generalized due process review of the procedure followed in this case once testing of this nuclear unit operator was positive for marijuana. In so doing, the arbitrator did not render an award that draws its essence from the parties' collective bargaining agreement, but instead dispensed his own brand of industrial justice consisting of his own view of what fairness and equity require in considering whether to terminate the employment of a formerly unescorted-access-authorized employee who failed a random drug test. Indeed the arbitrator's view of due process superimposed on labor-management relations in this case appears to be both procedural and substantive, for the arbitrator's decision appears to rest in part on the conclusion that Mr. Ingle's work history barred termination of his employment in this case.

The Council counters that the arbitrator's decision does draw its essence from the General Agreement and that the district court did not adhere to the strict standards for judicial review of that decision. We agree. The district court stated that the arbitrator had not pointed to language in the General Agreement which he was arguably construing. The court then concluded that "[t]he arbitrator's reliance on the generalized substantive and procedural due process stated by him to apply in this case was not founded on any definite law of the shop or custom or practice defining the contents of 'just cause,' ... but was instead the product of his own assessment of the equity of TVA's procedures applied in this case...." To the contrary, as the Council correctly argues, in a section entitled "Termination or De-

motion for Cause," the express terms of the General Agreement provide for an employee grievance procedure to resolve an employee's complaints about having been "treated unfairly" or disagreements with supervisors regarding "the application of a policy to him/her." General Agreement, Supplementary Schedule B–VIII(A). Thus, the very issue before the arbitrator was whether TVA had treated Ingle unfairly, and the General Agreement explicitly reserved the resolution of that issue to the arbitrator.

We came to the same conclusion in *Anaconda Co. v. District Lodge No. 27 of the Int'l Ass'n of Machinists and Aerospace Workers,* 693 F.2d 35 (6th Cir.1982), a case in which we upheld an arbitrator's decision reinstating an employee who was dismissed for excessive absenteeism. The arbitrator in that case found that the company had improperly denied the employee's request for union representation at a disciplinary meeting. The arbitrator concluded that the denial constituted a violation of the collective bargaining agreement's provision that the company would treat its employees "fairly and justly," which the arbitrator read "as providing the employee with a form of procedural due process." *Id.* at 37. In upholding the arbitrator's award, we said: "The arbitrator was not modifying the provisions of the collective bargaining agreement on absenteeism but rather was interpreting the provision that the Company treat its employees 'fairly and justly.'" *Id.* We thus concluded that phrases such as "fairly and justly" allow an arbitrator to consider the lack of procedural fairness in a discharge. See *id.*; see also *Chauffeurs, Teamsters and Helpers Local Union No. 878 v. Coca–Cola Bottling Co.,* 613 F.2d 716, 719 (8th Cir.1980) ("The Company indicates surprise at being presented with an arbitrator's award in which 'just cause' was interpreted as having a fair hearing dimension. We think that this surprise is unfounded; arbitrators have long been applying notions of 'industrial due process' to 'just cause' discharge cases.").

Thus, although the district court correctly recognized this court's holding in *Beacon Journal* that one of the manners in which an arbitrator's award could fail to draw its essence from the collective bargaining agreement is when "it is based on 'general considerations of fairness and equity' instead of the exact terms of the agreement," *Beacon Journal,* 114 F.3d at 600, that legal doctrine has no applicability in an instance such as this one, in which the collective bargaining agreement expressly provides for arbitrators to resolve employee grievances about allegedly unfair treatment by his or her employer. The district court's conclusion otherwise led it to substitute its own notions of industrial fairness for that of the arbitrator. This result is problematic because proper resolution of employee grievances is a subject matter in which courts have little expertise. See *United Steelworkers of America v. Warrior and Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("The ablest judge cannot be expected to bring the same experience and competence to bear upon a determination of a grievance, because he cannot be similarly informed."). It is also unacceptable because it is the arbitrator's construction of the agreement and conceptions of the requirements of fairness, not the court's, to which these parties have agreed. See *Misco,* 484 U.S. at 37–38, 108 S.Ct. 364 ("Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept.").

■ The district court also agreed with TVA's assertion that not only did the arbitrator's decision fail to derive its essence from the General Agreement, but it also conflicted with another agreement between the parties entitled the Framework Agreement. According to the district court, the General Agreement must be "read in the light of the relevant provisions of the

Framework Agreement," which is "key to understanding the nature of labor-management relations governed by the [General Agreement]." The parties entered into the Framework Agreement in April 1992, four months before the General Agreement was renewed in August 1992. The parties agree that the Framework Agreement provides that TVA retains all authority over internal security practices, which allows TVA the flexibility to develop internal practices that comply with the many federal regulations applicable to nuclear power plants. Specifically, the Framework Agreement provides that "[e]xcept as expressly modified or restricted by a specific provision of this Agreement, all statutory and inherent management rights are retained by TVA," including the authority "(a) to determine its ... internal security practices; to suspend, discharge, or otherwise discipline employees for cause, and to direct and assign work." Framework Agreement at 1. The Framework Agreement also designates, inter alia, the following items as management responsibilities over which "TVA is not obligated to bargain:"

(1) matters governed by federal law, including regulations and executive orders. (To the extent that the law provides flexibility in its implementation, such matters are within the scope of bargaining unless otherwise excluded by this Agreement.)

\* \* \* \* \* \*

(3) the program for determining fitness for duty related to TVA's nuclear facilities.

\* \* \* \* \* \*

(4) the development and operation of health and safety rules and requirements....

\* \* \* \* \* \*

(6) TVA's published standards and responsibilities for employee conduct, which are designed to ensure that TVA employees meet high standards of honesty, integrity, impartiality, and conduct....

Framework Agreement at 2.

■ The Council urges that neither the district court nor this court is entitled to consider the interplay between the arbitrator's interpretation of the General Agreement and the Framework Agreement, citing cases holding that "[w]hen construction of the [collective bargaining agreement] implicitly or directly requires application of 'external law,' i.e., statutory or decisional law, the parties have necessarily bargained for the arbitrator's interpretation of the law and are bound by it." *American Postal Workers Union v. United States Postal Serv.*, 789 F.2d 1, 6 (D.C.Cir.1986). The Council argues that the same principle applies to an arbitrator's interpretation of other contractual agreements between the parties. TVA counters that the General Agreement here specifically provides that the arbitrator does not have the authority "to render a decision contrary to federal law or regulation applicable to TVA ... [or] to rule on any matters not specifically set forth in this General Agreement and Supplementary Schedules." General Agreement at 62. Thus, despite Council's objections, determining whether the arbitrator exceeded his authority in either of those ways requires closer inquiry into the relationship between the Framework Agreement and the arbitrator's interpretation of the General Agreement.

According to the district court, the arbitrator's decision "added to or modified the General Agreement, not merely by elaborating procedural requirements in a case of employee discipline involving an admitted nuclear safety violation, but also by mandating that such a violation and resultant loss of unescorted-access authorization may not lead to termination of employment when the employee's work history is of a certain, but undefined, quality." The district court, therefore, concluded that the arbitrator's decision interferes with TVA's control over its program for determining fitness for duty and

thereby violates the provisions of the Framework Agreement.

In its briefs on this issue, TVA acknowledges that the General Agreement provides that TVA employees may be terminated or demoted only for cause and that an employee may file a grievance if he believes he has been treated unfairly or disagrees with his supervisors as to the application of a policy to him. TVA also acknowledges that this court has held that phrases in collective bargaining agreements ensuring that employees will be treated "fairly and justly" allow an arbitrator to consider the lack of procedural fairness in a discharge. See *Anaconda*, 693 F.2d at 37. However, TVA urges the court to adopt the distinction articulated by the district court that "that in this case the arbitrator did not undertake a due process review of TVA's decision to terminate Mr. Ingle's employment, but rather undertook a due process review of the decision that he was not sufficiently trustworthy and reliable for access to Watts Bar, and was not sufficiently trustworthy and reliable to receive medical clearance to work as a reactor unit operator." TVA further urges us to conclude, as did the district court, that "[t]he collective bargaining agreements reserve those judgments about trustworthiness and reliability to TVA."

As an initial matter, we note that the "collective bargaining agreements" do not address TVA's authority over determinations of fitness for duty. The only collective bargaining agreement is the General Agreement, and it makes no mention of that issue. Second, we find the two issues that TVA and the district court attempt to distinguish to be inextricably intertwined. It appears that once TVA had removed Ingle's security and medical clearances, the decision to terminate his employment was virtually automatic because, without those clearances, Ingle no longer could perform his job. Thus, if there is any meaning to the General Agreement's provision that an arbitrator may resolve an

employee's grievance about lack of fairness in TVA's termination of his or her job, the arbitrator must be able to consider whether the determination to remove his security and medical clearances was conducted fairly. Nothing in the Framework Agreement conflicts with that conclusion. In fact, although the Framework Agreement removes determinations of fitness for duty from the scope of bargaining, it further provides that the Council's agreement that TVA's program for determining fitness for duty and its published standards and responsibilities for employee conduct are not within the scope of bargaining "will not be used by TVA to restrict any right that the Council would otherwise have to challenge TVA's actions on those matters which go beyond the requirements of federal law." Framework Agreement at 2.

Although the arbitrator does not discuss the Framework Agreement in his opinion in this case, the parties have included in the record other decisions by the same arbitrator in which he discusses the Framework Agreement's reservation to TVA of control over the substance of its program for determining fitness for duty. Accordingly, the arbitrator was clearly aware of that agreement and the federal regulations underpinning it. Although he did not "rule on" the Framework Agreement, or even mention it in his opinion, the arbitrator may have considered the manner in which his interpretation of the General Agreement impacted the Framework Agreement. He may have concluded that although the Framework Agreement provided TVA with ultimate control over determinations of fitness for duty, the General Agreement required that in making that decision, or the closely related decision to terminate an employee's employment, TVA was required to afford the employee with a reasonable amount of fairness and due process. Whatever the arbitrator's reasoning, his interpretation of the General Agreement in this case does not conflict with the Framework Agreement. Hence, the arbitrator's decision is not contrary to

federal law or regulation nor does it rule on the provisions of the Framework Agreement. We therefore conclude that in reaching his decision, the arbitrator was acting within the scope of the authority granted to him by the General Agreement.

In sum, the arbitrator's award in the case at bar does not suffer from any of the infirmities articulated in Beacon Journal that would support the conclusion that it fails to draw its essence from the collective bargaining agreement: it is rationally derived from the agreement; it does not conflict with any express terms of the agreement; it does not impose additional requirements not expressly provided for in the agreement, because the agreement expressly provides for arbitration of the fairness of TVA's treatment of its employees; and although it is based on "general considerations of fairness and equity," it does not do so "instead of the exact terms of the agreement," as admonished by Beacon Journal, but instead does so in compliance with the terms of the agreement.

██ Finally, TVA argues that if we rejects its argument that the arbitrator's award should be vacated because of its failure to draw its essence from the collective bargaining agreement, we should nonetheless vacate the arbitrator's award as violative of public policy. The Supreme Court has held that "the question of public policy is ultimately one for resolution by the courts, and has instructed courts 'to refrain from enforcing' an arbitration award if the contract, as interpreted by the arbitrator, 'violates some explicit public policy.'" *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). "Such a public policy, however, must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* (internal quotation marks omitted); accord *Misco*, 484 U.S. at 43, 108 S.Ct. 364 (interpreting *W.R. Grace* and clarifying that the Court did not "otherwise sanction a broad judi-

cial power to set aside arbitration awards as against public policy"); *Monroe Auto Equip. Co. v. UAW Local 878*, 981 F.2d 261, 269 (6th Cir.1992) (applying *Misco* and *W.R. Grace* in holding arbitration award reinstating employee discharged for violating employer's drug policy did not violate public policy). The district court declined to address this argument, because it had already decided to vacate the arbitration award based on its conclusion that the award did not draw its essence from the collective bargaining agreement. Nonetheless, the district court opined that it found TVA's argument on this issue to be "especially strong." In support of that opinion, the court cited *Iowa Electric Light & Power Co. v. IBEW Local 204*, 834 F.2d 1424 (8th Cir.1987), in which the Eighth Circuit refused to reinstate a nuclear power plant employee whose on-duty misconduct had deliberately compromised a reactor safety system. The district court found that despite the arbitrator's finding that termination was too severe a sanction for the misconduct, "there is a well defined and dominant policy requiring strict adherence to nuclear safety rules." *Id.* at 1427; accord *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665, 671 (11th Cir.1988) (vacating award because flying an airplane while intoxicated violated public policy).

The district court concluded that the public policy that would be violated by the reinstatement of Ingle was articulated in the Nuclear Regulatory Commission's regulations concerning management actions and sanctions to be imposed in a case in which a nuclear power employee is unfit for duty because of illegal drug abuse. Those regulations provide, "Each licensee subject to this part shall, as a minimum, take the following actions. Nothing herein shall prohibit the licensee from taking more stringent action." 10 C.F.R. § 26.27(b). TVA also cites the following regulations as the bases for finding that upholding the arbitrator's order to reinstate Ingle would violate public policy: "In

conducting the psychological assessment mandated by [Nuclear Regulatory Commission] regulations, TVA must evaluate the possible impact of any noted psychological characteristics which may have a bearing on trustworthiness and reliability (10 C.F.R. § 73.56(b)(2) (1998)). Further, TVA is obligated to provide 'high assurance' that persons granted unescorted access to its nuclear plants 'are trustworthy and reliable, and do not constitute an unreasonable risk to the health and safety of the public' (10 C.F.R. § 73.56(b)(1) (1998))."

We have previously articulated the proper inquiry for analyzing whether an arbitration award should be vacated as violative of public policy. In *Board of County Comm'rs v. L. Robert Kimball and Assoc.,* 860 F.2d 683, 686 (6th Cir.1988), we cited *Misco,* for the proposition that "[a] court may refuse to enforce an award when specific terms in the contract would violate public policy, but there is no broad power to set aside an arbitration award as against public policy." We subsequently explained that "[t]he issue is not whether grievant's conduct for which he was disciplined violated some public policy or law, but rather whether the award requiring the reinstatement of a grievance, i.e., 'the contract as interpreted,' *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183, violated some explicit public policy." *Interstate Brands v. Teamsters Local Union No. 135,* 909 F.2d 885, 893 (6th Cir.1990) (upholding arbitration award ordering reinstatement of delivery van driver despite criminal charges filed against him for possession of cocaine, marijuana, and drug paraphernalia while off duty). The opinion in Interstate Brands notes that "[w]hile it is indisputable that allowing intoxicated persons to drive motor vehicles violates public policy, it does not follow, however, that any arbitration award reinstating an employee discharged for being intoxicated while off-duty, or arrested for off-duty possession of controlled substances may never be enforced without violating the public policy exception of arbitration awards." *Id.*

We conclude that the arbitrator's award requiring TVA to reinstate Ingle does not violate any explicit public policy, as neither the terms of the collective bargaining agreement nor the arbitrator's interpretation of that agreement violates public policy. In so holding, however, we are not wholly unsympathetic to TVA's concerns. If the arbitration award were to be interpreted as requiring TVA to reinstate Ingle's security clearances without any further proceedings, as TVA apparently interprets it, the question of whether it violated public policy would be more difficult. More fundamentally, such an award likely would exceed the arbitrator's authority under the General Agreement, which does not authorize an arbitrator to dictate a substantive outcome of a fitness determination nor the manner in which the company weighs the various considerations relevant to that decision. However, we believe that the arbitrator's award is more fairly interpreted as requiring that TVA reinstate Ingle and conduct a hearing to determine Ingle's fitness for duty in a manner that comports with the due process and fairness concerns articulated in the opinion. Under that interpretation, if TVA were to determine again, after a fair hearing, that Ingle's security and medical clearances should not be reinstated, the company is, of course, free to terminate him at that time for cause. Such an award does not exceed the arbitrator's authority under the General Agreement, which reasonably can be interpreted as authorizing the imposition of due process requirements necessary to ensure fairness in TVA's employment decisions, based on the arbitrator's determination, on a case-by-case basis, of what that entails. As this court stated in Anaconda, while a provision requiring an employer to treat its employees "fairly" is "very broad and gives the arbitrator great discretion, the Company agreed to such discretion when it signed the agreement." *Anaconda,* 693 F.2d at 37. To hold otherwise would eviscerate the Gen-

eral Agreement's provision of a neutral arbitrator to resolve employees' grievances about being treated "unfairly" by TVA. Moreover, such an award does not violate any federal law or regulations. As the Second Circuit recently held, "[i]t is thus evident that nothing within the [Nuclear Regulatory Commission] regulations prohibits the re-employment of an employee who yields a first positive on a drug test, provided that adequate assurance of the employee's rehabilitation is obtained." *Int'l Bhd. of Elec. Workers, Local 97 v. Niagra Mohawk Power Corp.,* 143 F.3d 704, 718–19 (2d Cir.1998).

## CONCLUSION

The arbitrator's decision in this case draws its essence from the collective bargaining agreement between the parties, and enforcement of the award does not violate any public policy. Accordingly, we REVERSE the district court's judgment and REMAND this case for the entry of an order confirming and enforcing the arbitration award.

RALPH B. GUY, JR., Circuit Judge, dissenting.

I respectfully dissent. There is no dispute that under the General Agreement employment may be terminated only for cause and the grievance procedure provides that "[i]f an employee believes [he] has been treated unfairly or [he] disagrees with [his] supervisors as to the application of a policy ... [he] may file a grievance." In the Framework Agreement, however, the TVA and the Council agreed that "all statutory and inherent management rights are retained by TVA, including the authority: (a) to determine ... internal security practices" and that TVA is not obligated to bargain over certain management responsibilities including "(1) matters governed by federal law, including regulations and executive orders" and "(3) the program for determining fitness for duty related to TVA's nuclear facilities." The arbitrator's jurisdiction is limited by the General Agreement's grievance procedure as follows:

The arbitrator's jurisdiction is limited to interpretation and application of the terms of the General Agreement and it supplementary schedules or cases involving employee discipline (termination, demotion, suspension, or warning letter). The arbitrator does not have the authority to add to, subtract from, or modify any term or provision of the Agreement or to render a decision contrary to federal law or regulation applicable to TVA. Likewise, the arbitrator has no authority to rule on any matters not specifically set forth in this General Agreement and Supplementary Schedules.

In this case, the arbitrator did not review whether Ingle's termination was "for cause" or interpret any term of the contract but, rather, reviewed the fairness of the process that resulted in the revocation of Ingle's nuclear operator clearances and unescorted access authorization. I agree with the district court that the arbitrator's decision did not involve an interpretation of the contract and did not draw its essence from the contract, but added or modified the agreement by adding procedural requirements and consideration of an employee's past work history. *Cf.Bruce Hardwood Floors v. Southern Council of Indus. Workers,* 8 F.3d 1104, 1108 (6th Cir.1993) ("Requiring a formal investigation and hearing before discharge, when these procedural safeguards are not specifically provided for in the agreement, may well ignore the plain language of the contract.") Further, it is apparent from the award as a whole that the arbitrator's decision was based on general considerations of fairness and equity instead of the exact terms of the agreement.