923 F.2d 488
 136 L.R.R.M. (BNA) 2288, 59 USLW 2496,
117 Lab.Cas. P 10,500
 AP PARTS COMPANY, Plaintiff-Appellee,
v.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; United
Automobile, Aerospace and Agricultural Implement Workers of
America, Local 14, Defendants-Appellants.
 No. 90-1199.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 3, 1990.
Decided Jan. 22, 1991.
 
 Charles C. Hawk, Michael A. Snapper (argued), Miller, Johnson, Snell & Cumminskey, Grand Rapids, Mich., for plaintiff-appellee.
 Joan Torzewski (argued), Lackey, Nusbaum, Harris, Reny & Torzewski, Toledo, Ohio, for defendants-appellants.
 Before MERRITT, Chief Judge, JONES, Circuit Judge, and WELLFORD, Senior Circuit Judge.*
 MERRITT, Chief Judge.
 
 
 1
 Defendant, UAW, appeals from a summary judgment granted by the District Court in favor of the plaintiff, A.P. Parts, in AP's action to vacate an arbitration award under Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1947). The question before us does not arise from a grievance by an individual employee, as is usually the case. Rather the question, as further explained below, is whether the arbitrator gave an irrational construction to an important contract provision, allowing him then to direct the parties to renegotiate terms already settled in contract talks, thereby undermining the operation of a new bonus incentive system designed to increase plant-wide productivity and job security. Judge Woods found the award to be contrary to the plain language of the contract and granted summary judgment in favor of AP. For the reasons set forth below, we agree.
 
 
 2
 * * * * * *
 
 
 3
 AP, a manufacturer of exhaust systems and other parts for the automobile industry, and the UAW have operated under collective bargaining agreements for many years. The UAW brought this arbitration under a contract which became effective in 1987 in order to settle a dispute which first arose under the previous 1985 contract.
 
 
 4
 In the early 1980's AP faced major cost problems and demanded basic concessions from the Union. Because AP and the Union could come to no agreement on the concessions, the employees struck from May 1984 to February 1985. The 1985 contract settling the strike covered the period 1985-1987 and incorporated some of the demands for concessions the Union had earlier rejected. The new agreement assigned to machine operators the work of inspection and quality control and eliminated separate inspector positions. The 1985 contract also redesigned the bonus system by giving bonuses to employees based on plant-wide performance rather than rewarding individual production based on a "piece-work" system.
 
 
 5
 The new system did not work smoothly. The system apparently rewarded increased production at the expense of quality because Ford, a major customer, advised AP prior to the expiration of the 1985 agreement that it would discontinue its orders unless quality improved.
 
 
 6
 In early 1987, in response to Ford's complaints, AP instituted a revised inspection system for quality control. AP did not reintroduce the old system of separate inspectors. Instead the company added a new set of inspections to be done by the machine operators, thus continuing the workload design agreed to in the 1985 contract. The revised system increased by five minutes an hour or 40 minutes per eight hour shift the time each machine operator would spend on inspection of parts. The additional time spent for inspection decreased proportionally (about 8%) the time each operator would spend making parts. AP added this new inspection system to the operators' tasks under the 1985 agreement. It continued as part of the 1987 agreement.
 
 
 7
 The Union saw the addition of this inspection task to the responsibility of machine operators as reducing bonuses and voiced its objections to the company. Prior to the expiration of the 1985 contract and during negotiations for the 1987 contract, AP and the UAW discussed possible bonus system adjustments arising from the revised inspection program. They could not agree, and so they simply left in effect the pertinent language of the old agreement governing bonus pay for increased productivity. That language is technical and cannot be understood without some further explanation.
 
 
 8
 Under both the 1985 and the 1987 agreements, bonuses were to be paid based on plant-wide productivity. The agreements based the bonus productivity figure for a given pay period on a comparison between the actual results of work in the plant and a model of efficient production. The amount of satisfactory parts, called "finished goods," produced in a given number of payroll hours was compared to the number of goods a relatively efficient worker would be expected to produce in a standard hour. Finished goods were the total parts produced minus the parts returned for poor quality. The concept of a "standard hour" was introduced for the purpose of establishing the time it would take a relatively efficient worker to make 100 parts. Thus the "standard hour" was not a 60 minute hour.
 
 
 9
 Plant-wide productivity was then calculated by first multiplying the quantity of finished goods times standard hours. That product was then divided by "total payroll hours" or actual hours worked. The formula for deriving the productivity ratio is expressed by the parties as follows:
 
 
 10
 finished goods X standard hours = productivity ratio total
 
 
 11
 payroll hours
 
 
 12
 Once the plant-wide productivity ratio was calculated, the hourly bonus was figured on a scale set out in the contract. A productivity ratio of .341-.360 triggered an hourly bonus of $.25. The hourly bonus increased with increases in the ratio to $4.25 per hour for a productivity ratio of .521-.530.
 
 
 13
 The formula worked so that an increase in standard hours or in finished goods or a decrease in total payroll hours would raise the productivity ratio and therefore raise the total bonus paid to the employees. The dispute between AP and the UAW occurred because AP refused to change the standard hours component in the formula when it added the five minute per hour inspection to the operators' responsibility. In effect, AP expected the operators to be able to make as many quality parts in an hour as they had done before the inspection time was added, despite the machine downtime that occurred during the inspection. The Union saw this addition of inspection responsibility as reducing the operators' chance to make a bonus. AP countered by saying that the bonus opportunity could be retained if the inspections resulted in better quality control and therefore a greater quantity of finished goods, that is, goods produced minus returns for poor quality. Thus the opportunity for bonus depended on increased quality as well as on increased production.
 
 
 14
 AP derived its authority to refuse the Union's demands to increase the standard hours figure in the productivity formula from Appendix D Sec. 3(c) in the 1985 and 1987 collective bargaining agreements:
 
 
 15
 Jobs ... not previously (prior to ratification) included in standard hours ... [such as] inspection ... will not be added to standard hours for purposes of determining the productivity ratio ... unless the parties have mutually agreed upon the overall effect upon the productivity ratio.
 
 
 16
 In AP's view this provision of the contract allowed exactly the action it had taken: adding inspection tasks, which had never been included in standard hours, to the operators' responsibility without changing the standard hours figure. AP added this inspection before the 1985 contract expired, arguing that the "inspections" fell into the category of jobs "not previously included" in standard hours before the 1985 ratification. The Union objected to the addition of the inspection without increasing standard hours and presented the question as an issue for bargaining during the 1987 contract negotiations. AP refused to concede on the issue, and the Union dropped it. The old contract language was left in effect when the 1987 contract was presented, signed, and ratified by the membership. The new inspection system continued in the plant.
 
 
 17
 After the 1987 ratification, the Union grieved AP's right to add the new inspection without modifying the standard hours figure. AP denied the grievance. The issue was then heard by an arbitrator pursuant to an arbitration clause in the collective bargaining agreement which allowed the arbitrator to "interpret or apply" the agreement but not to "add to, detract from, ignore or change any terms of this agreement." Jt.App. at 25.
 
 
 18
 The arbitrator's award was unusual. He did not find that the new inspection system violated the agreement or required standard hours to be increased. Instead, he said that he did not have "sufficient information to formulate an opinion as to the impact" of the new inspection "on the incentive opportunity or productivity ratio." In his award, he said "[T]he matter is remanded to the parties for a resolution that will accommodate the matter without reducing the incentive opportunity." He offered "further adjudication" if the parties were unable to agree.
 
 
 19
 The arbitrator arrived at his conclusion and made his award in the following manner. He apparently interpreted the provision which enabled the company to assign inspection tasks to operators without adding the time to standard hours to mean that the new five minute per hour inspection could be added only if it did not reduce incentive opportunity, i.e. bonuses.
 
 
 20
 The arbitrator arrived at that ruling by interpreting the word "ratification" to refer back to the "ratification" of the 1985 agreement rather than to mean the 1987 agreement that he was interpreting and under which the arbitration was initiated. The arbitrator then interpreted "[j]obs ... not previously ... included in standard hours" to mean those specific jobs not part of standard hours in 1985, relying partially on the use of the past tense. Finally, he read the general word "inspection" as not including the new inspection about which the parties bargained in forming the 1987 contract. As a result, he read the provision to mean that tasks such as the new inspection were not included in the tasks that AP could assign without adding the time to standard hours. He then concluded that the contract did not tell the parties what to do about the new inspection, and that they must resolve that problem by further negotiation.
 
 
 21
 In reading the provision to say that the word "ratification" did not mean the 1987 ratification, the arbitrator ignored the fact that the very issue in dispute before him had been negotiated during the formation of the 1987 contract: the Union had raised the issue of modifying standard hours to accommodate the new inspections and then dropped it after AP refused to include the time lost for the inspections in the standard hours figure of the productivity formula.
 
 
 22
 Interpreting "ratification" to refer to a different agreement than the 1987 agreement under which the arbitration was conducted and to exclude the inspection work which had begun before the current agreement, the arbitrator justified his finding in terms of equity and common sense. His sense of equity led him to believe that increased inspection time would decrease the productivity bonus, much as it might have under the old piece-work, individual productivity award system. The arbitrator did not appear to examine the formula as a whole, with its balanced incentive for quality control, and his concern about equity led him to find a way to give an award.
 
 
 23
 The award directed the parties to examine the effect of adding the new, five minute per hour inspection to the operators' responsibility. If they discovered that the inspection decreased the opportunity for employee bonus, they were to negotiate a modification to the standard hours figure so that the employees would retain their former incentive opportunity. In effect, the arbitrator found the parties to be in dispute over an issue not covered by the agreement. Then, despite not having found AP in violation of any contract provision, he directed the parties to negotiate an addendum to their agreement. The arbitrator thus gave the Union ground on which to negotiate a system-wide productivity increase that had been rejected specifically at the 1987 bargaining sessions and ordered AP to renegotiate an issue it had won in contract talks.
 
 
 24
 The arbitration clause of the 1987 agreement does not empower the arbitrator to reopen the contract talks or act as a discussion leader with the promise to resolve a stalemate if the contract talks fail. He is to interpret and apply the agreement and resolve disputes. It is not within the arbitrator's authority to direct the parties to negotiate an issue they have already negotiated because the contract does not comport with the arbitrator's sense of equity. The arbitrator's offer to help the parties negotiate a new term for their agreement if they could not come to a resolution on their own is not a satisfactory substitute for deciding issues and resolving disputes or dismissing the grievance if there is no contract violation.
 
 
 25
 In light of the Supreme Court's directive to the lower federal courts to review arbitration awards with great deference, see United Paperworkers International Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (affirming Steelworkers Trilogy ), this Court is very reluctant to vacate an arbitrator's award. See Eberhard Foods, Inc. v. Handy, 868 F.2d 890 (6th Cir.1989) (upholding arbitrator's reinstatement of discharged employee because arbitrator was not denied the power to consider fairness in just cause discharge). We do not review awards for mistakes of interpretation or even mistakes in law. See Misco, 484 U.S. at 38, 108 S.Ct. at 370-71. Only when an award departs from the contract, only when it does not "draw[ ] its essence from the collective bargaining agreement," Steelworkers v. Enterprise Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), do we reverse the judgment of the arbitrator.
 
 
 26
 Even Misco, however, does not allow the arbitrator to "ignore the plain language of the contract." 484 U.S. at 38, 108 S.Ct. at 371. Here, the arbitrator ignored the plain language of the contract and rendered an award outside the purview of his authority, directing the parties to negotiate again what they had settled in their 1987 contract talks.
 
 
 27
 Thus, in spite of the deference we owe to the arbitration process, we must affirm the District Court in vacating the arbitrator's award.
 
 
 
 *
 The Honorable Harry W. Wellford assumed senior status on January 21, 1991