946 F.2d 895
 141 L.R.R.M. (BNA) 2984
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
The MEMPHIS DISTRICT OF BROWNING-FERRIS INDUSTRIES OF
TENNESSEE, INC., Plaintiff-Appellee,
v.
TEAMSTERS LOCAL UNION NO. 984, Defendant-Appellant.
 No. 90-5933.
 United States Court of Appeals, Sixth Circuit.
 Oct. 10, 1991.
 
 Before BOGGS, Circuit Judge, KRUPANSKY, Circuit Judge, and DUGGAN, District Judge.*
 PER CURIAM.
 
 
 1
 This case returns us to familiar legal terrain: the degree of deference exercised by courts towards the decision of an arbitrator interpreting the terms of a labor union contract. Teamsters Local Union No. 984 ("Union") appeals from the district court's grant of summary judgment for plaintiff, which thereby overturned an arbitrator's decision respecting a grievance under the Union/Browning-Ferris Industries ("BFI") collective bargaining agreement ("CBA"). Although we are mindful that an arbitrator's decision is due great deference, we hold that this arbitrator's decision was outside the scope of his authority, and therefore affirm the district court.
 
 
 2
 * This case revolves around BFI's discharge of an employee, Larry Scott, for dishonesty and/or theft. Because the basis for this appeal is the arbitrator's opinion, not the facts of the discharge, we will only briefly describe the facts.
 
 
 3
 Scott was discharged because he refused to return to its rightful owner, Mr. Stough, the money contained in a wallet that he found during working hours. Scott contended that he was neither dishonest nor a thief because Stough had told him that he could keep the money if he returned the wallet and its contents. Stough acknowledged that conversation, but changed his mind when the wallet was actually found because he had already gone to the expense of cancelling all of the checks and credit cards contained in the wallet. BFI reimbursed Stough for all of the money after Scott agreed to return only 50% of the cash. BFI then discharged Scott without a written warning.
 
 
 4
 Scott grieved his discharge, and this grievance ultimately came before an arbitrator for resolution. It is undisputed that the following terms of the CBA were implicated by this grievance.
 
 
 5
 2.01 It is recognized that the operation of the business [and] the right to ... discipline, suspend and discharge any employee for cause ... are vested solely and exclusively with and retained by the company, except as specifically modified by the terms of this agreement.
 
 
 6
 * * *
 
 
 7
 * * *
 
 
 8
 3.01 The employer shall not discharge an employee without a prior written warning and/or a disciplinary suspension, unless the cause of such discharge is: dishonesty; theft....
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 6.03 D. The Arbitrator shall not have the authority to add to, ignore, or modify any of the terms of the provisions of this Agreement.... The arbitrator shall have no authority to add to the terms hereof or to impose on any party hereto limitations or obligations not specifically provided for in this Agreement. No Arbitrator shall have the power to substitute his judgment for that of management unless he finds that management acted in violation of express terms of this Agreement.
 
 
 12
 The arbitrator ruled in favor of the Union, holding that BFI's discharge of Scott was improper under the CBA. Unfortunately for a court sitting in review, the arbitrator did not concisely explain his reasoning and holding, or focus precisely on the term or terms of the CBA he was relying upon. Rather, his rationale must be discerned from a long and rambling opinion. The gist of his opinion is set forth at length below. This text is an exact copy taken from the record filed in our court. No effort has been made to mark individual places where difficulties may exist with the text.
 
 
 13
 First, let me say for the arbitration process to be meaningful, one has to respect the intent of the parties regarding their collective bargaining agreement. The duty of this Arbitrator is to ascertain the truth and then apply applicable standards of the arbitration process. Article # (Discipline) was agreed to by the parties in the instant case. However, discipline must be for just cause. Such is widely practiced and accepted by the labor-management community. Each party recognizes the issue of DISCHARGE is a most serious matter arising out of the collective bargaining agreement between the parties. Such will be treated likewise by this Arbitrator. Therefore, I will not recant the contentions of each party since both the Company and the Union were well-represented at the hearing and in the timely filing of post-hearing briefs.
 
 
 14
 In order for discharge to be for good/just cause management's action cannot be arbitrary, capricious, unreasonable, or based on mistake of fact. If the just cause standard is to have any real meaning in contract administration, management cannot abdicate its responsibility to undertake the task of distinguishing between wrongful conduct meriting discipline and unfortunate circumstances, which demand little forebearance.
 
 
 15
 First, it must be pointed out that the Personnel File (Company Exhibit 3) of Larry Scott shows that he is not exactly a model employee regarding attendance, following supervisor work orders, and various other activities associated with acceptable employee work behavior. It is well accepted that in a service oriented business, especially the one that BFI is engaged in that the "image" of employees of the company be very positive as they are highly visible in the residential and commercial community in the Memphis, Tennessee area. The Arbitrator fully understands the Company's position regarding it's paying customer and client based business in so far as the activities of grievant Larry Scott. The facts in this instant case are quite clear. However, there was considerable conflicting testimony regarding the exact time and location Grievant Scott found or located the wallet lost by Mr. Dan Stough. Grievant Scott testified he found the wallet after Stough had asked him had he (and Watt) located a lost wallet. The company pro-offered that Grievant Scott had the wallet prior to being approached by Stough in the parking lot of the Stonemill Apartment Complex. The issue is moot. The grievant indeed located/found a wallet which did not belong to him. However, the witness who actually saw Larry Scott pick up the wallet would have been extremely valuable to the company in this instant case regarding the exact time and location the wallet was located by Grievant Scott. If direct testimony was unavailable by this witness a sworn statement would have been acceptable. The company offered neither. While the Arbitrator deplores the action of Grievant Scott, the witness would have been critical to the disputed testimony. Grievant Scott showed extremely poor taste in not reporting the lost wallet to his supervisor or Stough immediately and with all contents left intact. Theft as defined (company brief, page 19) "in Webster's Dictionary as" the act of stealing; the felonies taking and removal of personal property with the intent to deprive the rightful owner of it; ... an unlawful taking of property." The Arbitrator fully agrees with this definition. However, owner Stough would have been better served by contacting the local law enforcement authorities to report the "theft" of his personnal wallet once he discovered who (Scott) he believed had located such. Contacting the company (BFI) was certainly appropriate but the forum for the "theft of personal property" is within the criminal system of justice. The Arbitrator perceives a distinct difference between theft of "personal property" and "company owned property" essential for this instant cause. The intent of the parties to the collective agreement (Article 3, Discipline) is controlling in this case. Furthermore, the wallet was ultimately returned to the owner intact, except for the $60.00 which the company reimbursed Stough for prior to the Arbitration hearing. The company did not quite meet the preponderance of evidence test that must be met for a discharge to meet muster and be sustained.
 
 
 16
 Therefore, it is the opinion of this Arbitrator the action taken by the Company in this instant case was not for good cause.
 
 
 17
 BFI filed suit in federal court to set aside the arbitrator's ruling and reinstate its discharge of Scott. The district court agreed with BFI and overturned the arbitrator's decision, holding that the arbitrator's decision added "an additional condition to the company's ability to discharge, by requiring that the theft be of company-owned property." The Union's timely appeal followed.
 
 II
 
 18
 * We are frequently called upon to review an arbitrator's decision purporting to apply a clause of a CBA to resolve a grievance. The Supreme Court has severely limited the review of such decisions, stating that an arbitrator's decision must be enforced by the federal courts if it "draw[s] its essence from the contract and [does not] simply reflect the arbitrator's own notions of industrial justice." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38, 108 S.Ct. 364, 371 (1987). This principle of extreme deference to an arbitrator's decision extends to factfinding, as "improvident, even silly factfinding" by an arbitrator is beyond reexamination by this court. See Misco, 484 U.S. at 39, 108 S.Ct. at 371. We have faithfully applied this standard to the cases before us, upholding the overwhelming number of arbitrator's decisions placed before us since Misco. See Lattimer-Stevens Co. v. United Steelworkers of Am., AFL-CIO, Dist. 27, Sub-Dist. 5, 913 F.2d 1166 (6th Cir.1990); Interstate Brands Corp., Butternut Breads Div. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135, 909 F.2d 885 (6th Cir.1990), cert. denied, 111 S.Ct. 1104 (1991); Dixie Warehouse and Cartage Co. v. General Drivers, Warehousemen and Helpers, Local Union No. 89, 898 F.2d 507 (6th Cir.1990); Vic Wertz Distributing Co. v. Teamsters Local 1038, Nat'l Conference of Brewery and Soft Drink Workers of the United States of Am. and Can., 898 F.2d 1136 (6th Cir.1990); Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc., 894 F.2d 862 (6th Cir.1990); Local 120, Int'l Molders & Allied Workers Union, AFL-CIO v. Brooks Foundry, 892 F.2d 1283 (6th Cir.1990); Eberhard Foods, Inc. v. Handy, 868 F.2d 890 (6th Cir.1989). Despite this very deferential standard of review, we have twice refused to enforce an arbitrator's award. AP Parts Co. v. International Union, United Auto. Aerospace and Agric. Workers of Am.; United Auto. Aerospace and Agric. Implement Workers of Am., Local 14, 923 F.2d 488 (6th Cir.1991); International Bhd. of Elec. Workers, Local 429 v. Toshiba Am., Inc., 879 F.2d 208 (6th Cir.1989).
 
 
 19
 This standard is easily applied in most cases in which we review an arbitrator's decision. In most cases, it is clear which CBA term the arbitrator is applying to resolve the grievance. This standard requires that we enforce any plausible construction of this term by the arbitrator, even one wholly at odds with what would be considered the "plain meaning" of the term. See Interstate Brands, 909 F.2d at 891-92 (arbitrator's decision that an indefinite suspension "occurred" every day, thereby permitting a grievance of such a suspension filed outside of the period allowed by the CBA for the filing of grievances to be considered as timely filed, upheld). In these cases, the Court's admonition that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision," Misco, 484 U.S. at 38, 108 S.Ct. at 371, is a sensible maxim implementing the requirement that we exercise the utmost deference in the face of an application of an arbitrator's judgment and experience.
 
 
 20
 The application of this standard, however, is not clear in a case like the one before us. Here, we are faced with an arbitrator's decision that does not purport to interpret or rely on a specific term of the CBA to resolve the grievance. In every other case since Misco where we have reviewed an arbitrator's decision interpreting a CBA term that resulted in a published opinion, the arbitrator consciously applied a specific term of the CBA to resolve the dispute. See generally Interstate Brands, 909 F.2d at 887 (Article VII--the word "occurrence"); Vic Wertz Distributing, 898 F.2d at 1142 (Article 8, sections 8.1(a), 8.6, and 8.8); Lattimer-Stevens, 913 F.2d at 1168-69 (Article XXIV--longevity wage increase section); Federated Dep't Stores, 894 F.2d at 867-69 (Sections 1.6, 1.11(G) & (J), 1.42(A), and 1.40(B)); Eberhard Foods, 868 F.2d at 892-93 (Article VII--"just cause" provision); Toshiba, 879 F.2d at 209 (Article 4, section 2); AP Parts, 923 F.2d at 490 (productivity bonus section). In Misco itself, the arbitrator interpreted the phrase that both parties agreed was essential to the resolution of the grievance--"just cause"--to reach his result. Therefore, it appears that it has been presumed that an arbitrator whose decision we are reviewing will actually interpret or apply a term of the CBA in reaching a decision, leaving us only the question of whether the decision "draws its essence from the contract."
 
 
 21
 When this presumption is absent, however, the Misco standard leads to the absurd result that an arbitrator's decision that does not interpret or rely on the contract can nevertheless be found to draw its essence from the contract. We can see this by analyzing the Court's key statement that a court must defer to an arbitrator's judgment whenever he or she is "arguably construing or applying the contract." Misco, 484 U.S. at 38, 108 S.Ct. at 371.
 
 
 22
 The key word in this sentence is the word "arguably." If this word is interpreted literally, without a presumption that the arbitrator actually interpret or rely on the contract, the Court appears to say this: whenever it can be said by a court sitting in review that the arbitrator is directly (construing) or indirectly (applying) the CBA, then that court may not set aside an arbitrator's decision even if the decision is manifestly erroneous.
 
 
 23
 This reading cannot be correct, however, as no arbitrator will ever issue a decision so removed from the CBA that it cannot be argued afterwards by either counsel or a judge that the contract played a part in the arbitrator's decision. The very fact of litigation means that someone is making that argument. Our decisions in AP Parts and Toshiba would be wrong under this standard, because in both cases it could be said that the arbitrator was applying the CBA. As arbitrators are not required to explain their reasoning when interpreting a CBA, United Steelworkers of Am. v. Enterprise Wheel and Car Corp., 363 U.S. 593, 598 (1960), this reading would insulate even cursory decisions like "Management wins" from review provided some legitimate argument can be made that would yield that result. As it is clear that an arbitrator's decision may be overturned if his decision represents "his own brand of industrial justice," Misco, 484 U.S. at 36, 108 S.Ct. at 370, quoting Enterprise Wheel, 363 U.S. at 597, some more restrictive construction of the word "arguably" must have been what the Court had in mind.
 
 
 24
 This construction is also inconsistent with the purpose underlying our deference to arbitrators. We defer to arbitrators' decisions because the parties have chosen to refer their disputes to an arbitrator rather than the courts, and federal labor policy is to give effect to the parties chosen method of dispute resolution. Misco, 484 U.S. at 36, 108 S.Ct. at 370; Enterprise Wheel, 363 U.S. at 596. However, the parties have bargained for the arbitrator's judgment, not the post-hoc judgment of attorneys and judges. The role of an arbitrator is therefore analogous to that of an administrative agency. As an arbitrator is empowered to resolve disputes only because of a CBA provision permitting recourse t an arbitrator, the agency is empowered to make decisions only because of a statute creating the agency entrusting legislative judgments to its care. As an arbitrator's decisions must draw their essence from the CBA creating the recourse to the arbitrator, an agency's decisions must draw their essence from the statute delegating authority to it. To complete the analogy, an administrative agency's decision--like that of an arbitrator--is entitled to extreme deference upon judicial review. However, the agency's decision can be affirmed only upon the grounds set forth by the agency itself, not upon post-hoc rationalization by counsel, because the agency's judgment is what Congress intended when it passed the authorizing statute. Motor Vehicle Mfr's Ass'n of the United States v. State Farm, 463 U.S. 29, 49-50 (1983); Securities and Exchange Comm'n v. Chenery, 332 U.S. 194, 196 (1947). If the Misco standard is applied without the presumption, private parties that bargain for an arbitrator's judgment will be forced to comply with decisions that are defensible only upon conclusions never reached by the arbitrator himself.
 
 
 25
 Applying the Misco standard only when the presumption underlying it is present removes the absurd result, and satisfies the parties' intent that the arbitrator resolve their disputes. We can see that when we recall the facts of Misco. In Misco, it was stipulated for the arbitrator that he had to decide whether the company had " 'just cause to discharge the Grievant under Rule II.1' and, '[i]f not, what if any should be the remedy.' " Misco, 484 U.S. at 33-34, 108 S.Ct. at 368. The arbitrator ruled against the company, holding that just cause was lacking. It is thus clear that it was the arbitrator's interpretation of a term vital to the resolution of the grievance that was the subject of Misco.
 
 
 26
 Viewed in this context, the Court's use of the word "arguably" leads to an entirely different result than our first construction: whenever the arbitrator's interpretation of the contract, whether directly (construing) or indirectly (applying) can be said to be correct, then even a belief of the reviewing court that the arbitrator was manifestly erroneous does not give the court power to set aside the decision. This construction permits reviewing courts to set aside only the most grossly erroneous decisions, those so wrong that it is clear that the arbitrator is dispensing his own justice rather than applying the parties' principles of justice as reflected in the CBA. This construction removes the absurd result and insures that arbitrators' decisions bargained for by the parties are given the finality they deserve.
 
 
 27
 It appears to us, then, that Misco requires reviewing courts to conduct a two-step inquiry. First, the court must examine the case before it to determine if the arbitrator interpreted or relied upon a term of the CBA to reach the decision. If the arbitrator has not done this, then it cannot be said in any way that the "essence" of the resulting decision is drawn from the contract. Second, if the arbitrator did interpret or rely upon a CBA term to reach the decision, then we apply the extremely deferential standard of review outlined earlier. As we shall show below, the arbitrator in this case did not interpret or rely on a term of the CBA in reaching his decision, and therefore the "essence" of his decision was his own sense of justice, not the CBA.
 
 B
 
 28
 An examination of this arbitrator's decision shows that he was not interpreting or relying on the contract. Instead, this arbitrator's decision discusses the facts surrounding the discharge, general principles of "just cause," the Webster's Dictionary definition of "theft," and the arbitrator's opinion that "DISCHARGE is a most serious matter." The closest this arbitrator comes to applying a concrete term of the CBA to the matter at hand is when he concludes with the statement "it is the opinion of this Arbitrator the action taken by the Company in this instant case was not for good cause." However, the only Article of the CBA cited by the arbitrator in the central portion of his opinion--"Article 3 (Discipline)"--contains no term that requires discharges to be for cause, just, good, or otherwise.
 
 
 29
 This arbitrator's introduction of the concept of "good/just cause" shows his lack of reliance on the contract. He does not state that the CBA requires that discharges be for just cause; rather, he states that a requirement that discipline be for just cause "is widely practiced and accepted in the labor-management community." Assuming this statement to be true, it does not mean that these parties have agreed to abide by that practice. CBAs are formed through hard bargaining over concrete terms that embody each party's desires. A term that discharge be for "just cause" is frequently one of those terms, and it is inserted into a final contract only if the party desiring it is strong enough to insist upon its inclusion. In the one case we have faced involving the determination whether a discharge was taken for "just cause," the CBA in question contained a specific term prohibiting discipline not based on "just cause." See Eberhard Foods, 868 F.2d at 892. Article 3.01 only establishes that, before management discharges an employee, that employee must be warned unless the employee is discharged for committing one of the acts enumerated in 3.01. Without a "just cause" provision in this contract, and the arbitrator nowhere shows us where such a provision might be contained, the arbitrator could not rely on that concept in his decision.
 
 
 30
 The arbitrator's opinion also is written in the tenor of a person who is faced with what he believes is an injustice, and has decided to right a wrong. As one example, the arbitrator states that "[i]f the just cause standard is to have any real meaning in contract administration, management cannot abdicate its responsibility to undertake the task of distinguishing between wrongful conduct meriting discipline and unfortunate circumstances, which demand little forebearance [sic]." This gives us the strong impression that the arbitrator believes that Scott's acts were an "unfortunate circumstance," not "wrongful conduct." Unfortunately for the arbitrator, Article 2.01 of the contract specifically vests discharge decisions in the management, and management's discretion may be curbed only by specific terms of the agreement. There is no term of the agreement that even remotely suggests that management is required to distinguish between "unfortunate circumstances" and "wrongful conduct" when disciplining its employees.
 
 
 31
 Other examples of the arbitrator's righteousness abound. He states that "DISCHARGE is a most serious matter." This is a truism, but it does not mean that an arbitrator judges management's decision any differently because of the serious effect that decision has. He further states that "owner Stough would have been better served by contacting the local law enforcement authorities to report the 'theft' of his personnal [sic] wallet once he discovered who (Scott) had located such," and "the wallet was ultimately returned to the owner intact." The arbitrator's opinions on who Stough should have called to get his wallet, and the money and checks therein, back and his observation that Stough ultimately was not seriously harmed are of no consequence to this case unless the arbitrator believed this to be more proof that Scott's act was merely an "unfortunate circumstance" not worthy of punishment. As shown above, this belief is irrelevant to the interpretation of the contract.
 
 
 32
 An examination of that portion of the arbitrator's decision that discusses Stough's failure to report to the theft yields the only possible term that the arbitrator can be said to have construed or relied upon in reaching his decision. The arbitrator states there that "[t]he Arbitrator perceives a distinct difference between theft of 'personal property' and 'company owned property' essential for this instant cause." Thus, it could be said that the arbitrator was construing the word "theft" in Article 3.01 in this passage, and that the arbitrator construed the word to mean "theft of company-owned property." If this were true, we would have to apply the Misco standard of deferential review to this decision. However, we do not believe that the arbitrator was construing the word "theft" here.
 
 
 33
 Our belief is founded on our understanding of the act of construing. That definition of "construe" in Webster's Third New International Dictionary that applies to the task of an arbitrator is "to put a construction on: discover and apply the meaning and intention of with reference to a particular set of affairs." The arbitrator did not discover the meaning of the word "theft" and apply it to the facts before him. This statement regarding "theft" is simply one more comment in a string of unconnected comments that the arbitrator made about the facts. It would be a judge who would be interpreting the word and applying it to Scott's acts, and it is precisely this post hoc rationalization that is not entitled to deference under Misco.
 
 
 34
 Nor do the arbitrator's offhand references to various contract provisions in the decision constitute "applying" the contract. "Apply" is defined in Webster's Third New International Dictionary as "to make use of as suitable, fitting, or relevant; to put to use for some practical effect." The arbitrator's references to Articles 2.01, 3.01, 6.03, and 25 under the heading "Pertinent Contract Provisions" do not constitute putting these provisions to use. Nor do his references to "Article 3 (Discipline)" in the bulk of the decision itself. The arbitrator never states that any provision compels him to reach a certain result, or enables him to make a certain judgment. Without this, his references are not central to his decision and hence are not applied to the case before him.
 
 III
 
 35
 * We hold in the alternative that the decision is not a construction or application of the contract even under the deferential Misco standard. Although this standard almost always results in enforcement of the arbitrator's decision, "[e]ven Misco, however, does not allow the arbitrator to 'ignore the plain language of the contract.' " AP Parts, 923 F.2d at 491, quoting Misco, 484 U.S. at 38, 108 S.Ct. 371. We hold that the arbitrator's decision ignores the plain meaning of the word "theft" in the contract, and hence can not be enforced.
 
 
 36
 Judge Horton correctly identified both the problem in and the solution to the arbitrator's decision. The problem is that it is unclear what CBA term the arbitrator was construing and applying to reach his decision. Assuming, as Judge Horton did, that the arbitrator had to have been construing and applying a term, Judge Horton found the correct solution when he reasoned that the arbitrator must have been interpreting the word "theft" to mean "theft of company-owned property." Most of gist of the arbitrator's decision involves a discussion of the facts surrounding Scott's theft. The arbitrator notes that no witness was produced who saw Scott pick up the wallet, implying that BFI thereby did not prove that Scott intended to steal Stough's wallet by a preponderance of evidence. The arbitrator also pointed out that Stough suffered no harm from the incident, and that "the forum for the 'theft of personal property' is within the criminal justice system." In light of these statements, and the large amount of time the arbitrator spent analyzing the circumstances and results of Scott's theft, Judge Horton reasonably concluded that the arbitrator's statement "[t]he Arbitrator perceives a distinct difference between theft of 'personal property' and 'company owned property' essential for this instant cause" was a clumsy way of interpreting the word "theft" to mean "theft of company-owned property." Judge Horton then correctly concluded that if this supposition were true, the arbitrator must have upheld the grievance because Scott's theft involved personal property, and hence was not a "theft" within the scope of the collective bargaining agreement.
 
 
 37
 This understanding is contrary to the plain meaning of the contract. The Arbitrator correctly noted that the definition of the word "theft" is "the felonious taking and removing of personal property with intent to deprive the rightful owner of it." Webster's Third New Int'l Dictionary. Stough's wallet certainly qualifies as "personal property," and hence Scott's taking of it and his refusal to return the money therein was "theft."
 
 
 38
 The Union and BFI could have limited management's discretion only to cases involving theft of company-owned property, but they apparently chose not to. It is certain that they knew how to limit management, as they agreed in the same article, 3.01, that certain acts could result in discharge only if they involved the company. For example, fighting and reckless or negligent accidents may result in discharge only if they occur "while on duty." Again, only willful destruction of "Company property" can result in discharge. Had the parties wanted make only theft of company property punishable by discharge, they could have followed their practice and clearly inserted such a restriction into the CBA. That they did not do so when they knew how to do so suggests that they did not intend to do so.
 
 
 39
 One could construe the word "theft" in tandem with the other acts punishable in Article 3.01, and argue that the parties intended to punish only those acts punishable under 3.01 that occurred while on duty. This implicit term can be derived in two ways. First, seven of the eleven acts in 3.01 specifically involve acts that occur only while on duty. Second, the other four acts--dishonesty, theft, the sale, use, possession or being under the influence of marijuana, alcohol or drugs, and scavenging or salvaging--are also usually thought of as being under the purview of the employer only if they occur while on duty. For example, it is unlikely that BFI and the Union intended to permit employer to discharge an employee for the purchase of a six-pack of beer for home use. Yet, without imputing an "on duty" term to the acts in 3.01, BFI could do this.
 
 
 40
 Even this broad reading, however, does not save the arbitrator's decision. Scott clearly took Stough's wallet while he was on duty. Scott was working near Stough's apartment, and he was not on break or lunch hour. Article 3.01 clearly permits BFI to fire workers based on thefts that occur while on duty.
 
 
 41
 One could also argue that the arbitrator was construing the word theft, but that he found that BFI did not prove that Scott possessed the requisite intent to steal the wallet and the money. That argument would rest on the arbitrator's statements that the lack of any testimony from a witness who observed Scott find the wallet was harmful to the company, and that the "witness would have been critical to the disputed testimony." These statements about the missing witness arise after the arbitrator notes that the parties disagree about when Scott found wallet, before or after Stough had talked with Scott. As it is undisputed that the wallet belonged to Stough and that Scott possessed it, the witness's testimony would be critical only in determining if Scott intended to keep the wallet regardless of a request to return it.
 
 
 42
 We do not believe that such a finding was made by the arbitrator. He specifically stated that the distinction between personal and company property was the essential factor. He also specifically stated that BFI's action was not "taken in good cause." Neither of these statements, the only ones where the arbitrator approaches providing a clear reason for his conclusion, is remotely connected to a finding that Scott could not be a thief because he did not intend to deprive the rightful owner of property.
 
 B
 
 43
 Our holding here is consistent with our prior opinions, particularly AP Parts. We set aside the arbitrator's decision in AP Parts because it ignored the plain language of the contract. The arbitrator in AP Parts, however, was much more reasonable and thoughtful than the one here. The arbitrator in AP Parts construed three sections of the contract before him, and applied them to reach what he considered an equitable result. AP Parts, 923 F.2d at 490-91. Here, the arbitrator did not even bother to construe a section of the contract, relying instead on a notion of "just cause" found nowhere in the contract.
 
 IV
 
 44
 For the foregoing reasons, we AFFIRM the district court's judgment setting aside the arbitrator's decision.
 
 
 45
 PATRICK J. DUGGAN, District Court Judge, dissenting.
 
 
 46
 I respectfully dissent. I agree with the majority that the arbitrator's decision in this matter is not a model of clarity. However, in my view, the arbitrator's finding that BFI improperly discharged Scott was based on his interpretation of the CBA. Applying the deferential standard of review traditionally given to arbitrators' decisions, I believe his decision should be upheld.
 
 
 47
 A fair reading of the arbitrator's opinion leads me to conclude that his finding that Scott's discharge was improper could have been based on two conclusions flowing from an interpretation of the CBA. First, the finding could have been based on a conclusion that BFI had failed to convince him that Scott had, in fact, committed a theft. Second, the finding could have been based on a conclusion that any theft, to be a cause for discharge under the CBA, had to be theft of company property, not the private property Scott had been accused of stealing.
 
 
 48
 With regard to the first possible conclusion, it certainly would have been helpful to a reviewing court if the arbitrator had definitely stated in his opinion whether he believed Scott had committed a theft. However, the arbitrator's comments in his opinion suggest to me that he entertained doubts as to whether Scott had committed a theft.[1] A finding that no theft had taken place, would not, in my opinion, be inconsistent with the evidence presented to the arbitrator. Further, as the majority points out, the principle of extreme deference to an arbitrator's decision extends to "improvident even silly fact finding," United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 39, 108 S.Ct. 364, 371 (1987). In other words, reading the arbitrator's opinion, I believe it is reasonable to conclude that, in applying the theft provision of the CBA to the dispute before him, the arbitrator was not satisfied that Scott had committed a theft. In my view, such a conclusion by the arbitrator would clearly draw its essence from the CBA's theft provision, and, applying a deferential standard of review, should be upheld. Id., 484 U.S. at 36-37, 108 S.Ct. at 370.
 
 
 49
 As to the second possible conclusion, that the arbitrator concluded that the CBA's theft provision required theft of company-owned property, I believe such a conclusion would also draw its essence from the CBA and should be upheld. The CBA nowhere defines the scope of the theft provision. Therefore, it would be permissible for the arbitrator to have interpreted the theft provision in the course of resolving the dispute put before him. See Id., 484 U.S. at 38, 108 S.Ct. at 371. That the arbitrator's interpretation of the provision might seemed strained, provides no reason to overturn his decision on review. Id. This Circuit has stated: "[I]t is immaterial whether we believe the arbitrator's analysis to be the best interpretation of the collective bargaining agreement; it is sufficient that it be a permissible interpretation." Retail Clerks Union Local No. 1557 v. Murfreesboro Vending Service, Inc., 689 F.2d 623, 626 (6th Cir.1982) (per curiam) (emphasis in original). The majority acknowledges in Part II A of its Opinion that the deferential standard of review requires "that we enforce any plausible construction of this term by the arbitrator, even one wholly at odds with what would be considered the 'plain meaning' of the term." In my opinion, an interpretation that the theft provision of the CBA only applied to theft of company-owned property is a "plausible construction" and a "permissible interpretation" of the CBA.
 
 
 50
 For the reasons stated, I believe the decision of the arbitrator should be upheld and the decision of the district court reversed.
 
 
 
 *
 The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 For example, the arbitrator, in his opinion, talks about the "crucial" missing witness. If the arbitrator based his decision solely on the issue of whether or not the theft had to be of company owned property, the testimony of this witness would not only not have been "crucial"--it would not even have been relevant. It was undisputed that the property involved was not company property